SO ORDERED: January 4, 2016.



*Basil H. Lorch III* (signature)

**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WILMA L. HORN | ) | Case No. 15-90240-BHL-7 |
| | ) | |
| Debtor. | ) | |

**ORDER DENYING UNITED STATES TRUSTEE'S MOTION TO DISMISS CASE**

This matter comes before the Court on the Motion to Dismiss Case (Doc. 14) filed by the United States Trustee (the "UST") on April 30, 2015 and the Objection to Motion to Dismiss Case (Doc. 19) filed by Debtor Wilma L. Horn (the "Debtor") on June 3, 2015. The Court conducted a hearing on the motion to dismiss on June 10, 2015, at which the Court took the matter under advisement and instructed counsel for the Debtor to investigate the status of the foreclosure on the Debtor's former residence. On August 8, 2015, counsel for the Debtor filed a Status Report (Doc. 21) regarding said foreclosure. After considering the foregoing and being otherwise duly advised, the Court finds that the United States Trustee's Motion to Dismiss Case should be **DENIED**.

1

**I. Introduction**

The UST has moved to dismiss or convert to chapter 13 the Debtor's case as an abuse of chapter 7 pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3). The UST does not allege bad faith. Rather, the UST asserts that with an elimination or reduction of the Debtor's retirement contributions and 401k loan repayments and an adjustment in the Debtor's tax withholdings, the Debtor would have significant monthly disposable income which would provide a substantial dividend to unsecured creditors through a chapter 13 plan. According to the UST, the uncertainty regarding the Debtor's employment and earnings as a casino dealer places her in a position in which she may be in greater need of chapter 7 discharge relief in the future than she is presently. The UST asserts that conversion to chapter 13 is therefore appropriate, as the recommended adjustments would provide funding for a chapter 13 plan and preserve the option for the Debtor to convert back to chapter 7 if her employment and financial situation deteriorates further. The Debtor, on the other hand, maintains that her voluntary retirement contributions are reasonably necessary given her age and retirement savings, and that her negative monthly income renders a chapter 13 bankruptcy unfeasible in this case.

**II. Findings of Fact**

The relevant facts of the case appear to be undisputed. The Debtor filed her chapter 7 bankruptcy petition on February 20, 2015. The Debtor scheduled claims totaling $11,470, including $10,540 of nonpriority unsecured claims. The nonpriority unsecured claims are primarily credit card debts. Also scheduled as a claim, but not factored into the foregoing total, is an "unknown deficiency balance" from the foreclosure on the Debtor's former residence. The Debtor's initial Schedules I and J set forth monthly income of $1,955.36 and monthly expenses of $2,174.19, for a net monthly income of -$218.83. Significantly, on Schedule I, the Debtor deducted from her monthly income $232.87 on line 5c for voluntary contributions for retirement plans (the Debtor's "Retirement Contributions") and $544.77 on line 5d for required repayments of retirement fund loans (the Debtor's "Retirement Loan Repayments"). The chapter 7 trustee

2

entered her Report of No Distribution on April 11, 2015. On April 30, 2015, the UST filed its Motion to Dismiss Case (Doc. 14). In the Motion to Dismiss Case, the UST noted the Debtor's deductions for her Retirement Contributions and Retirement Loan Repayments, as well as the fact that the Debtor's 2014 federal and state tax returns reflect an over-withholding of approximately $245 per month. The UST further stated that elimination or reduction of the Retirement Contributions and Retirement Loan Repayments and an adjustment in Debtor's tax withholdings would result in significant monthly disposable income and provide a substantial dividend to unsecured creditors over a five year plan.

The Debtor filed her Objection to Motion to Dismiss Case (Doc. 19) along with Amended Schedules I and J (Doc. 18) on June 3, 2015. In her Amended Schedule I, the Debtor added $254 of other monthly income on line 8h, which she specified as "tax over-withholding (pro-rated)." The Debtor also added to Schedule J expenses of $250 for a car payment on line 17a and $303 for vehicle maintenance and repair on line 21. With these amendments, the Debtor's Amended Schedule I and J set forth monthly income of $2,209.36 and monthly expenses of $2,727.19, for a net monthly income of -$517.83.

At the hearing on June 10, 2015, the parties stipulated to the admission of Exhibits 1-4, which are the Debtor's (1) pay advices for 2014, (2) pay advices for 2015, (3) retirement loans account statement, (4) and sales receipts evidencing vehicle repair and maintenance expenses. The Debtor testified as to the following, which the Court now incorporates into its findings of fact:

1. The Debtor is 53 years old.
2. The Debtor works as a table games dealer at the Horseshoe Southern Indiana Hotel and Casino (the "Casino"). She earns $6.82 per hour plus tips, which are collected by the casino and are distributed pro-rata amongst all dealers.

3

3. The Debtor's year-to-date earnings are down to $18,366.08 for 2015, which represents a 16% decrease from $21,799.31 in 2015. The Debtors hours have been reduced and her income from tips has decreased.

4. The decrease in the Debtor's hours and earnings are the result of a decline in business at the Casino. Due to the recession and new regional competition, the Casino has experienced decreased revenue.

5. The Debtor has $27,651.88 saved in her retirement account(s).

6. The Debtor is making voluntary Retirement Contributions of $232.87.

7. The Debtor owes a balance of $8,757.94 on two 401k loans, one from 2011 and one from 2013. Currently, the Debtor is making monthly payments of $544.77 toward these loans. Given the Debtor's current repayment schedule, the balance of these loans is set to pay off around October 2016.

8. The Debtor incurs significant vehicle repair and maintenance costs. Her average vehicle repair and maintenance cost over the previous three months has been $303, the figure added to Amended Schedule J. Currently, the Debtor's only means of transportation is a 1997 Ford Mustang with approximately 167,000 miles on it. Given the age and condition of this car, the Debtor can expect to continue to incur an average vehicle repair and maintenance cost of around $303 per month to keep the Mustang on the road. Alternatively, the Debtor will need to replace the Mustang with a new vehicle at an estimated replacement cost of $250 per month.

9. The Debtor's former residence was foreclosed upon by Shellpoint Mortgage ("Shellpoint"). The home went through a sheriff's sale at which it was sold back to Shellpoint. The Debtor turned possession of the home over to Shellpoint in February 2015 in exchange for $2,000 cash, but as of June 10, 2015 the Debtor was unaware of the deficiency balance owed to Shellpoint following the foreclosure.

4

On August 8, 2015, counsel for the Debtor filed a Status Report (Doc. 21) regarding the foreclosure on the Debtor's former residence. After speaking with Doyle Legal Corporation, PC, the law firm that handled the foreclosure sale, counsel for the Debtor learned that "the Property was sold on January 6, 2015, back to the mortgage company for $147,697.08. The deficiency balance at the time of sale was $79,591.98." Counsel for the Debtor was informed that she would need to contact Shellpoint directly for an official payoff amount. Counsel for the Debtor did not receive a response from Shellpoint after repeated attempts to ascertain an official payoff amount. As such, the Court finds that the best estimate of Shellpoint's claim for a deficiency balance following the foreclosure is $79,591.98.

### III. Discussion

Section 707(b)(1) permits dismissal or conversion of a case where the granting of relief under chapter 7 would be an abuse of the Bankruptcy Code. Dismissal for abuse under section 707(b)(1), in turn, relies upon the guidelines set forth in section 707(b)(3), which state:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider –
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

The UST bears the burden under 707(b)(3) to demonstrate the Debtor's bad faith or to show that the totality of the circumstances demonstrate abuse. The UST has not alleged bad faith, but rather that, given the totality of circumstances, the Debtor's financial situation demonstrates abuse of chapter 7 because there is monthly income available to sustain a chapter 13 bankruptcy.

The Bankruptcy Code does not define "totality of the circumstances." However, "it is well established that a debtor's actual current and future income and expenses, intentions, and

5

resulting ability or inability to pay are crucial to an assessment of the debtor's 'financial situation' under section 707(b)(3). *In re Grinkmeyer*, 456 B.R. 385, 389 (Bankr. S.D. Ind. 2011) (citations omitted). While a debtor's ability to pay a portion of unsecured debt has been held to be sufficient to establish abuse under section 707(b)(3), dismissal is not mandated on this factor alone. *Id.* (citations omitted). Courts also consider other factors relevant to a determination under section 707(b)(3). The court in In re *Hoffman*, 413 B.R. 191, 195 (Bankr. M.D. Pa. 2008), set forth the following comprehensive list:

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith; (6) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities.

In this case, the Court must consider the Debtor's circumstances and ability to pay nonpriority unsecured debt. An accurate assessment of the Debtor's ability to pay requires the Court to first determine whether the Debtor's Retirement Contributions and Retirement Loan Repayments should be permitted as reasonably necessary expenses in the context of section 707(b)(3). While many pre-BAPCPA cases applied a per-se rule that discretionary retirement contributions and repayment of retirement plan loans are never a reasonably necessary expense, an increasing number of courts now employ a case-by-case approach to the determination which considers the debtor's individual circumstances. *In re Hilmes*, 438 B.R. 897, 906 (N.D. Tex. 2010) (citing *In re Beckerman*, 381 B.R. 841, 846-47 (Bankr. E.D. Mich. 2008)); *In re Tucker*, 389 B.R. 535, 539-40 (Bankr. N.D. Ohio 2008). The mathematical ability to fund a chapter 13 plan if retirement contributions or repayment of retirement loans are

6

reduced is alone insufficient to establish that the expense is unreasonable or abusive. *Tucker*, 389 B.R. at 541.

The Debtor in this case is 53 years old with retirement savings of $27,651.88 in a 401(k) account. She is at least 9 years away from early retirement, and 14 years away from normal retirement.[1] The Debtor's monthly gross income is $3,945.63. Her monthly Retirement Contribution is $232.87 and her monthly Retirement Loan Repayment is $544.77. The Debtor's schedules set forth a modest overall budget and the UST has not objected to any other of the Debtor's expenses. While there has been no indication that the Debtor is in immediate danger of losing her job at the Casino, her diminished hours and tip income can reasonably be expected to continue given the Casino's downtrend.

In sum, we have a debtor over 50 who is living a modest lifestyle, has minimal retirement savings, and faces some employment instability. The Court assumes that she will be entitled to Social Security benefits upon retirement, but she lacks any property of significant value and does not appear to have any other source of retirement income. The Court cannot conclude that it is unreasonable for a person in the Debtor's situation to be contributing $232.87, or 5.9% of her gross income, toward her 401(k) plan, or to be repaying 401(k) loans to preserve the balance she has thus far saved. It is also worth noting that the UST does not dispute that the Debtor would be allowed to continue making her Retirement Loan Repayments if she were in a chapter 13 bankruptcy, and said money could not be used to fund her chapter 13 plan. *See In re Phillips*, 417 B.R. 30, 42-43 (Bankr. S.D. Ohio 2009). For these reasons, the Court finds that the Debtor's Retirement Contributions and Retirement Loan Repayments are reasonably necessary expenditures, and, as such, should not be considered disposable income in assessing the Debtor's ability to pay.

---

[1] The Debtor may start receiving Social Security retirement benefits as early as 62, and her full retirement age is 67.

Turning now to the Debtor's ability or inability to pay, the Court must consider the monthly income that the Debtor actually has available to pay nonpriority unsecured debt. The Debtor's Amended Schedule I sets forth combined monthly income of $2,209.36. That figure includes $254 of pro-rated tax over-withholding, an amendment added to Schedule I following the UST's Motion to Dismiss Case. Amended Schedule J lists monthly expenses of $2,727.19. That figure factors in the Debtor's Retirement Contributions and Retirement Loan Repayments. Also factored into the amended monthly expense total are the $250 car payment expense and the $303 vehicle maintenance and repair expense. It is unclear from Amended Schedule J and the June 10 hearing whether the $250 car payment expense represents a new car payment that the Debtor has already incurred alongside her $303 vehicle repair and maintenance expense, or whether it represents the contingent replacement cost for a new vehicle which would supplant her current vehicle repair and maintenance expense if she needed to replace her 1997 Ford Mustang. For the sake of this analysis, the Court will consider the $250 car payment an expense which is contingent on the Debtor's need to replace the Mustang. As the Debtor continues to operate the Mustang as her primary vehicle, the Court will accordingly deduct $250 from the Debtor's monthly expenses. Thus, the Debtor's adjusted monthly expenses are $2,477.19. Even so, after factoring the Debtor's tax over-withholding into monthly income as suggested by the UST and removing a contingent $250 car payment expense, the Debtor still has net monthly income of -$267.83.

Notwithstanding the Debtor's inability to pay, there are factors that support the UST's argument for requiring the Debtor to make a run at a chapter 13 bankruptcy. It is true that, given the Debtor's current repayment schedule, the Debtor's 401k loans will pay off around October 2016 and the Debtor may enjoy positive net monthly income and ability to pay at that time. The Debtor also faces some risk that her employment situation may continue to deteriorate in the future, and she may find herself in need of chapter 7 discharge relief where it is unavailable for another 8 years if she is indeed granted a chapter 7 discharge now. However,

with the Debtor's current net monthly income of -$267.83, a chapter 13 plan does not presently appear to be feasible for any amount of time. Furthermore, the estimated deficiency balance of $79,591.98 following the Debtor's foreclosure brings the total amount of nonpriority unsecured debt in this case to $90,132. The significant deficiency balance increases the Debtor's need for discharge relief at present. Finally, in considering the totality of the circumstances for the purpose of determining the presence of abuse of chapter 7, the Court does not find any of the other *Hoffman* factors to weigh against the Debtor.

### IV. Conclusion

Based upon the foregoing, the Court finds that the Debtor's Retirement Contributions and Retirement Loan Repayments are reasonably necessary expenditures, and, as such, should not be considered disposable income in assessing the Debtor's ability to pay in the context of section 707(b)(3). Furthermore, the Court finds that the totality of the Debtor's circumstances do not demonstrate an abuse of chapter 7 under section 707(b)(3). The Debtor does not presently have the ability to pay nonpriority unsecured debt through a chapter 13 plan and no *Hoffman* factors indicating abuse are present in this case. Accordingly, the UST's Motion to Dismiss Case (Doc. 14) should be, and hereby is, **DENIED**.

**SO ORDERED.**

###